UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CONTACT SOLUTIONS, LLC,

                              Plaintiff,

              -against-

DANIEL O'SULLIVAN AND GYST, INC.,

                              Defendants.

Civil Action No. 15-cv-04292

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**Page:**

I.      Introduction ................................................................................................1

II.     Statement of Facts ......................................................................................2

        A.      CS Purchases Adaptive Audio and Employs O'Sullivan .......................2

                1.      The Asset Purchase Agreement ................................................2

                2.      The Employment Agreement and Proprietary Information Agreement ......4

                3.      The Employee Handbook ..........................................................5

        B.      CS' Proprietary and Copyrighted Adaptive Audio Software ................6

                1.      Adaptive Optimization ............................................................6

                2.      Adaptive Audio .......................................................................7

        C.      O'Sullivan Serves as CS' Principal Technologist and Expert in Adaptive Audio ..7

        D.      CS Declines to Renew O'Sullivan's Employment ................................8

        E.      O'Sullivan's Baseless Arbitration ......................................................8

        F.      Defendants Begin Marketing the Infringing Gyst CX ...........................9

III.    **Argument** ................................................................................................12

        A.      CS is Likely to Succeed on the Merits of its Copyright and Trade Secret Claims against O'Sullivan and Gyst ................................................................12

                1.      CS is Likely to Succeed on the Merits of its Copyright Claim .................12

                2.      CS is Likely to Succeed on the Merits of its Trade Secret Claim .............15

                3.      CS is Likely to Succeed on the Merits of its Breach of Contract Claim ...17

        B.      CS Will Suffer Irreparable Harm if Injunctive Relief is Not Granted ...................19

        C.      The Balance of Harms Weighs Strongly in Favor of CS ........................21

Conclusion ................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ahmad v. Long Island University,* 18 F.Supp.2d 245, 247 (E.D.N.Y. 1998) .............................. 12

*Apple Computer Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir.1983) ....... 19, 22

*AWP, Inc. v. Commonwealth Excavating, Inc.*, No. 5:13CV031, 2013 WL 3830500, at *6 (W.D.
    Va. July 24, 2013) .................................................................................................................... 17

*Boisson v. Banian, Ltd*., 273 F.3d 262, 269 (2d Cir. 2001) .......................................................... 14

*Bowe Bell & Howell Co. v. Harris*, 145 F. App'x 401, 403 (4th Cir. 2005)................................. 18

*Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 828-29 (E.D. Va. 2011)................................... 18

*Bull v. Logetronics, Inc.*, 323 F.Supp. 115, 133 (E.D.Va.1971).................................................... 17

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35
    (2d Cir. 2010)............................................................................................................................ 12

*City Merchandise v. Broadway Gifts, Inc.*, No. 08-Civ-9075, 2009 WL 195941, *1 (S.D.N.Y.
    January 27, 2009)...................................................................................................................... 14

*CJ Products LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 144 (E.D.N.Y. 2011) ....... 13, 19

*Complex Systems, Inc. v. ABN AMRO Bank N.V.*, 2014 WL 1883474, * 11 (S.D.N.Y. May 9,
    2014) ........................................................................................................................................ 20

*Concrete Mach. Co. v. Classic Lawn Ornaments*, 843 F.2d 600, 612 (1st Cir.1988) .................. 22

*Decision Insights, Inc. v. Sentia Grp., Inc.,* 416 F. App'x 324, 329 (4th Cir. 2011)............... 15, 17

*Esbin & Alter, LLP v. Sabharwal, Globus, & Lim, LLP*, 403 F. App'x 591, 592 (2d Cir. 2010). 12

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 361 (1991).......................................... 13

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) ........................ 20

*Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997) ........................................................ 13

*Informatics Applications Grp., Inc. v. Shkolnikov*, 836 F. Supp. 2d 400, 422 (E.D. Va. 2011) ... 15

*Int'l Bus. Machines Corp. v. Johnson*, 629 F. Supp. 2d 321, 335 (S.D.N.Y.) ............................. 20

*Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d
    1224, 1228 (2d Cir. 1992) .......................................................................... 12

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002)  19

*MicroStrategy, Inc. v. Bus. Objects, S.A.*, 331 F.Supp.2d 396, 416 (E.D.Va.2004) ............... 15, 16

*MicroStrategy, Inc. v. Li*, 268 Va. 249, 601 S.E.2d 580 (Va. 2004) ........................................... 16

*Mint, Inc. v. Amad*, No. 10 Civ. 9395 (SAS), 2011 WL 1792570, at *3 (S.D.N.Y. May 9, 2011)
    ................................................................................................................. 21

*Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp. 2d 118, 131 (S.D.N.Y. 2000) .................. 20

*My–T Fine Corp. v. Samuels*, 69 F.2d 76, 78 (2d Cir.1934) ....................................................... 22

*Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir.1971) ........... 20

*Pearson Educ., Inc. v. Vergara*, 09 Civ. 6832(JGK)(KNF), 2010 WL 3744033, 2010 U.S. Dist.
    LEXIS 101597 (Sept. 27, 2010) ............................................................... 20

*Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) ................................................. 19, 20

*Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F. Supp. 2d 565, 575
    (E.D. Va. 2004) ................................................................................... 16, 17

*Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 414 (S.D.N.Y. 1999) .............................. 13, 14

*Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 448 (S.D.N.Y. 2014) ............... 13

*Trident Products & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 778
    (E.D. Va. 2012) aff'd, 505 F. App'x 242 (4th Cir. 2013) ............................... 15, 16

*Warner Bros. Entm't Inc. v. RDR Books*, 575 F.Supp.2d 513, 553 (S.D.N.Y.2008) .................. 22

*WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 601 (S.D.N.Y. 2011) aff'd, 691 F.3d 275 (2d Cir.

2012) .............................................................................................................. 12, 20, 21

**Federal Statutes**

17 U.S.C. § 410(c) .................................................................................................. 13

17 U.S.C. § 502(a) .................................................................................................. 13

**State Statutes**

VA. CODE ANN. § 59.1–336 ..................................................................................... 15, 16

**Treatises**

3 NIMMER ON COPYRIGHT § 14.06[A], at 14–50, 14–51 & n. 16................................................. 19

Plaintiff Contact Solutions, LLC ("CS") submits this memorandum of law in support of its Motion for a Preliminary Injunction against Defendants Daniel O'Sullivan and Gyst, Inc. ("Gyst").

## I.   INTRODUCTION

This action arises from copyright infringement and misappropriation of trade secrets and confidential business information by a former employee of CS, Defendant O'Sullivan, after CS declined to renew his two year term of employment last year.

In 2012, CS hired O'Sullivan as its Principal Technologist and purchased O'Sullivan's company, including all intellectual property rights of any kind relating to its Interactive Voice Response ("IVR")-related computer software technology, known as Adaptive Audio.

After CS declined to renew O'Sullivan's contract of employment, CS discovered that O'Sullivan and a new sole proprietorship, Defendant Gyst, are brazenly marketing a virtually identical IVR software product, Gyst CX, that infringes upon CS' copyrighted Adaptive Audio Software.  On Gyst's website, O'Sullivan admits that the *newly* offered Gyst CX utilizes the same technology as the Adaptive Audio Software that he previously developed and sold to CS. It states:  "Our technology has been (and continues to be) production proven over *several hundred million self-service telephone calls to date*."  (Emphasis added).  Defendants' creation and marketing of Gyst CX also constitutes misappropriation of CS' trade secrets and a clear breach of O'Sullivan's confidentiality and non-disclosure obligations under his Employment Agreement with CS.

As a consequence of Defendants' misconduct, CS is entitled to preliminary and permanent injunctive relief prohibiting Defendants from further infringing on CS' copyrighted Adaptive Audio Software, misappropriating CS' trade secrets and confidential information, and breaching O'Sullivan' clear contractual obligations.

1

## II.   STATEMENT OF FACTS

CS designs, develops and hosts customer contact telephone automation solutions for large government and commercial enterprise clients.  *See* Declaration of Vete Clements ("Clements Dec.") ¶ 2.  These services are commonly referred to as IVR solutions.  *See id.*

O'Sullivan is an IVR technologist.  *See id.* ¶ 3.  Prior to May 2012, O'Sullivan was the sole proprietor of Interactive Digital ("ID"), a technology company that developed an IVR-related software technology known as Adaptive Audio.  *See id*.  Adaptive Audio is a proprietary technology designed to improve the customer experience for callers, and reduce operational costs to clients, by gathering information concerning caller behavior and adjusting the speed of the IVR prompt playback in response to individual user behavior during a call.  *See id.* ¶ 4.

### A.   CS Purchases Adaptive Audio and Employs O'Sullivan

In 2012, O'Sullivan contacted CS and proposed to license the Adaptive Audio software and technology to CS.  *See id.* ¶ 5.  Instead, after a series of discussions, on May 15, 2012, the parties entered into (1) an Asset Purchase Agreement ("APA") under which CS agreed to purchase all of the assets of ID, including all rights in and to the Adaptive Audio software and technology (the "Adaptive Audio Software"), and (2) an Employment Agreement under which CS agreed to employ O'Sullivan as Principal Technologist for a term of two years.  *See id.*

#### 1.   The Asset Purchase Agreement

Under § 2.1 of the APA, CS agreed to purchase, and ID agreed to sell, all of ID's Assets, including all Software, Equipment, Intellectual Property and Intellectual Property Rights set forth in Schedule A thereto, including the Adaptive Audio source and object code and related programs, files and documentation.  *See* Clements Dec., Exh. 1, APA §§ 1, 2.1 & Sched. A.[1]

---

[1] Section 6.3 of the APA provides that the Agreement is to be interpreted and governed by the internal laws of the State of Virginia.

Section 1 of the APA defines the term "Software" to include all of "the source code and object code discussed on Exhibit A," including the "Adaptive Audio API source code, Adaptive Audio user interface source code, Adaptive Audio configuration files, Adaptive Audio software installation program, [and] Adaptive Audio users guide." *See id.*, Sched. A.[2]

Section 1 of the APA, broadly defines the term "Intellectual Property" to mean:

> [A]ll intellectual property owned, licensed or developed by ID including any or all of the following (i) works of authorship including, without limitation, computer programs, source code, and executable code, whether embodied in software, firmware or otherwise, documentation, designs, files, records, data and mask works, (ii) inventions (whether or not patentable), improvements, and technology, (iii) proprietary and confidential information, trade secrets and know how, (iv) databases, data compilations and collections and technical data, (v) logos, trade names, trade dress, trademarks and service marks, (vi) domain names, web addresses and sites, (vii) tools, methods and processes, and (viii) any and all instantiations of the foregoing in any form and embodied in any media.

Finally, Section 1 of the APA broadly defines "Intellectual Property Rights" to mean:

> [A]ll proprietary or other rights throughout the world provided under (i) patent law, including inventions, whether patentable or not, issued patents, applications therefor pending before any relevant  authority worldwide, including, without limitation, any additions, continuations, continuations-in-part, divisions, reissues, reexaminations, renewals or extensions based thereon, (ii) copyright law, (iii) trademark and service mark law, (iv) design patent or industrial design law, (v) semi-conductor chip or mask work law, (vi) trade secret or trade dress law, and (vii) any other

---

[2] Section 1 of the APA broadly defines "Source Code" to mean: "[T]he source code associated with the Software including the underlying instructions for a computer written in programming languages, including all embedded comments, as well as procedural code such as job control language statements, in a form readable by human beings when displayed on a monitor or printed on paper, etc. and that must be translated (using off-the-shelf commercially available software compilers, linkers and assemblers or other items delivered to or reasonably available to ID) into a form that is directly executable by a computer by a process generally known as compiling or assembly, along with any related Documentation, including annotations, flow charts, schematics, statements of principles of operations, software summaries, software design, program logic, program listings, functional specifications, logical models and architecture standards, describing the data flows, data structures, and control logic of the software."

statutory provisions, common law principle or principle of law under any jurisdiction in the world which provides proprietary or other intellectual property rights.

## 2.     The Employment Agreement and Proprietary Information Agreement

Under § 7(a) of the Employment Agreement, O'Sullivan agreed, as a condition of employment, to execute and abide by the company's standard Proprietary Information, Inventions, Non-Competition and Non-Solicitation Agreement (the "Proprietary Information Agreement").[3] *See* Clements Dec. ¶ 13 & Exh. 2, Employment Agreement § 7(a).

Under § 1.1 of the Proprietary Information Agreement, O'Sullivan was bound as follows:

> At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use, or publish any of the Company's Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with my work for the Company, or unless an officer of the Company expressly authorizes such in writing.

Clements Dec., Exh. 3, the Proprietary Information Agreement § 1.1.

Section 1.2 of the Proprietary Information Agreement specifically defines Proprietary Information to include "trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques." *Id.* § 1.2.

Section 9 of the Proprietary Information Agreement requires that, at the conclusion of employment, O'Sullivan return all originals and copies of all Proprietary Information in his possession or control.  It states: "When I leave the employ of the Company, I will deliver to the Company any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary Information of the Company." *Id.*

---

[3] Section 8(e) of Employment Agreement likewise provides that it is to be governed by the internal laws of the State of Virginia.

§ 9.

Finally, in § 10.1 of the Proprietary Information Agreement, O'Sullivan, as employee, agrees that "it may be impossible to assess the damages caused by my violation of this Agreement or any of its terms.  I agree that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to the Company and the Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach or threatened breach of this Agreement.  *Id.* § 10.1.  O'Sullivan further agrees that "if the Company is successful in whole or in part in any legal or equitable action against me under this Agreement, the Company will be entitled to payment of all costs, including reasonable attorney's fees, from me."  *Id.* § 10.2.

### 3.    The Employee Handbook

In connection with his employment, O'Sullivan also received and acknowledged a copy of CS' Employee Handbook.  *See* Clements Dec. ¶ 18 & Exh. 4.  Page 8 of the Employee Handbook discusses the employee's duties of confidentiality and non-disclosure.  It states, in relevant part:

> It is the policy of Contact Solutions to ensure that all Company proprietary information is adequately safeguarded. . . . In accordance with your [Proprietary Information] Agreement, you agree not to release, disclose, publish or discuss confidential information or Company trade secrets, including but not limited to client names or information, contractual information including terms and conditions, pricing or similar information, technical information, rates, billing information or financial information (including names or locations of financial institutions).  Your Confidentiality Agreement applies to information pertaining to prospective clients, current clients, and former clients, as well as to vendors and service providers with which the Company has contracts or service relationships.

*Id.* at 8.

5

**B.    CS' Proprietary and Copyrighted Adaptive Audio Software**

Following the APA, CS became the sole and exclusive owner of the proprietary Adaptive Audio Software.   *See* Clements Dec. ¶ 19.   CS used reasonable steps to maintain the confidentiality and secrecy of the Adaptive Audio Software, which is stored behind corporate firewalls with access—via secure remote services—granted only to certain, trusted individuals with the proper password levels.   *See id.* ¶ 20.   In addition, on May 1, 2015, CS registered Adaptive Audio Source Code Version 7 as a computer program with the United States Copyright Office (U.S. Reg. No. TX0008016083).   *See id.* ¶ 21 & Exh. 6.

CS' copyrighted and proprietary Adaptive Audio Software consists of two components, Adaptive Optimization and Adaptive Audio.   *See id.* ¶ 22.

**1.    Adaptive Optimization**

Adaptive Optimization is a measuring tool designed to capture caller behavior interaction data as it happens, measuring caller skill level, time spent per goal, error counts, goal completion success, and more to provide analytics for caller interactions at a very detailed level.   *See id.* ¶ 23.   The software collects calibration data from a configurable number of phone calls, including the duration of interactions, and the rate of success and failure.   *See id.*   It then processes and analyzes the calibration data to associate the duration and success of interactions with a range of user skill levels.   *See id.*

Adaptive Optimization recognizes patterns establishing whether the caller is a novice or expert user; is calling from an environment with high background noise; or is using a mobile phone that may have a weak signal.   *See id.* ¶ 24.   It does this anonymously, based upon observed aggregate behavior, rather than through the collection and use of specific user information.   *See id.*

### 2.   Adaptive Audio

Adaptive Audio applies data gathered and analyzed by Adaptive Optimization to customize user experience in the IVR by automatically and dynamically adjusting call flow in real time to address the needs of the caller. *See id.* ¶ 25. The software calculates the duration of each user interaction to determine user skill level, and the success or failure of user interactions to calculate a level of user frustration. *See id.* It then recommends personalized adjustments to the user's needs. *See id.*

For example, Adaptive Audio can speed up or slow down the pacing (words per minute) of the call flow; provide alternate message content based on caller needs; give users having difficulty more time to respond; help expert users complete their goals more quickly; optimize call flow for interaction points proven by data to be difficult (or easy) for most callers; and leverage interaction data from Adaptive Optimization to determine the best modality (DTMF or speech) for particular interaction points. *See id.* ¶ 26.

### C.   O'Sullivan Serves as CS' Principal Technologist and Expert in Adaptive Audio

O'Sullivan served as CS' Principal Technologist. *See id.* ¶ 27. His primary duties were to work with the software engineering team to incorporate the Adaptive Audio software into CS' platform and to work with Sales and Marketing to produce marketing material and train the sales team to sell the product. *See id.* O'Sullivan also worked directly with CS telemarketing resources to develop an outbound sales campaign to reach out to his existing customer contacts, and other CS customers and prospects, to promote the Adaptive Audio product as a part of the overall CS offer. *See id.* The telemarketing team then followed up with calls to coordinate phone or face-to-face meetings with O'Sullivan and/or CS sales representatives. *See id.*

During his employment with CS, O'Sullivan worked remotely from his home in

Larchmont, New York, where he had complete access to CS' proprietary and confidential information, including the source code of CS' copyrighted Adaptive Audio Software, as well as information concerning CS' customers, business methods, finances and other sensitive company information. *See id.* ¶ 23. Such proprietary and confidential information is valuable, not known outside of CS' business, and would be difficult for outsiders to duplicate. *See id.* CS would not have allowed O'Sullivan access to its proprietary and confidential information if O'Sullivan was not bound to maintain its confidentiality pursuant to the Employment Agreement, Proprietary Information Agreement and Employee Handbook. *See id.*

### D.    CS Declines to Renew O'Sullivan's Employment

Despite an investment of over $1.6 million and substantial efforts by CS and O'Sullivan to implement and sell Adaptive Audio, the product did not obtain traction with CS' customers as a cost saving device. *See id.* ¶ 31. Accordingly, on November 21, 2013, CS provided O'Sullivan notice that it would not be renewing his term of employment, and thus O'Sullivan's employment would conclude on May 15, 2014. *See id.* ¶ 32 & Exh. 7.

### E.    O'Sullivan's Baseless Arbitration

Rather than accept this result, O'Sullivan unproductively lashed out at CS. On July 6, 2014, O'Sullivan initiated meritless arbitration proceedings against CS in the Employment Division of the American Arbitration Association (the "Arbitration"), asserting that CS failed to give him proper notice of his termination and thus, under § 1 of the Employment Agreement, O'Sullivan's employment was automatically renewed for another year. *See id.* ¶ 33.

After a hearing on November 12, 2014, the arbitrator found that CS' notice of non-renewal was timely, properly delivered and properly authorized, and denied O'Sullivan's claims in their entirety. *See* Clements Dec., Exh. 7.

In the course of the Arbitration, CS learned that on multiple occasions, O'Sullivan

transmitted to third parties confidential and proprietary information concerning CS' negotiations with O'Sullivan, as well as an active sales engagement.  *See* Clements Dec., Exh. 8.

### F.       Defendants Begin Marketing the Infringing Gyst CX

Following his termination, O'Sullivan failed to return, copied, reproduced and prepared unauthorized derivative works based upon CS' Adaptive Audio Software.  *See* Clements Dec. ¶ 36.

Specifically, O'Sullivan created, and began selling and marketing, a similar—if not identical—IVR-related software product under the name "Gyst CX," employing the intellectual property, business logic, and know-how that CS purchased from O'Sullivan/ID under the APA. *See id.* ¶ 37 & Exh. 9.

The Gyst website (www.gystusa.com) describes Gyst CX as "personalization software for voice self-service."  *Id.* ¶ 38 & Exh. 9.  It continues to describe a substantially identical software product for monitoring user behavior, analyzing samples, deriving user skill levels and customizing individual calls.  *Id.*  For example, it states:

> [Gyst CX] measures, analyzes and ultimately personalizes the experience to suit the skill, expertise and behavior of callers in the IVR.  Faster, or more skilled and accurate callers hear the voice interaction at gradually increasing playback speeds (words per minute spoken), throughout the call.  Slower, less skilled or less knowledgeable callers hear the dialogue progress at a slower pace. In addition, struggling callers get additional instructions and time to respond, while faster callers may hear abbreviated instructions in order to speed them through the dialogue.
>
> In all cases, Gyst CX gives the caller experience they want.  That helps them self-serve in the IVR and get the answers they need without getting frustrated by a system that won't make allowances for them the same way a good customer service representative would.

*Id.*, Exh. 9.

The Gyst website confirms that Gyst's technology is not newly developed, but is a legacy

of O'Sullivan's prior ventures, terminating in his sale of ID to CS. *Id.* ¶ 39. For example, although a fledgling enterprise, the Gyst website states that:

- "Our technology has been (and continues to be) production proven over several hundred million self-service telephone calls to date;" *id.* & Exh. 9, and

- "[O]ur clients have saved hundreds of millions of dollars on over 1.5B user interactions to date. Some of the most progressive companies in the world use our technologies to streamline, optimize and reduce costs for their day-to-day operations." *Id.* & Clements Dec., Exh. 10.

In addition, the Gyst website, and O'Sullivan's separate blog (www.cooluserexperience.com), rely upon various white papers, metrics, charts and graphics which O'Sullivan used in his efforts to sell and promote the Adaptive Audio Software while employed by CS. *Id.* ¶ 40.

By letter dated April 15, 2015, CS demanded that, on or before April 24, 2015, O'Sullivan and Gyst confirm that they would cease and desist from developing, utilizing, advertising or marketing CS' Intellectual Property in any manner or form, including but not limited to in the form of Gyst's Gyst CX product. *See* Press Dec. ¶ 5 & Exh. 1.

Neither O'Sullivan nor Gyst responded to CS' demand. *See id.* ¶ On the contrary, O'Sullivan and Gyst have continued developing, utilizing, advertising or marketing CS' proprietary and copyrighted Adaptive Audio Software. *See* Press Dec. ¶ 6.

**G.     Defendants Attempt to Avoid Service of the Complaint**

On June 5, 2015, a law clerk advised CS' counsel that, because CS was not seeking a temporary restraining order, CS should make a motion for preliminary injunction on notice, after completing service of process on the defendants. *See id.* ¶ 9. However, as CS learned when it attempted to serve O'Sullivan and Gyst with the Complaint in this matter, O'Sullivan utilized a post office box and did not publicly disclose a home address. *See id.* ¶ 10 & Exh. 3. Similarly,

CS learned, Gyst was not filed with the New York Secretary of State as a valid corporation, and thus did not disclose a registered agent for service of process.  *See id.*  Accordingly, CS requested that Michael S. Cox, O'Sullivan's counsel in a breach of contract action pending against CS in New York state court (the "State Action"), accept service on behalf of O'Sullivan and Gyst.  *See id.* ¶ 10 & Exh. 4.  Mr. Cox refused.  *See id.*

CS then attempted to serve O'Sullivan and Gyst—which, despite its name, is not incorporated in any state, and thus is a sole proprietorship—at the home address Mr. O'Sullivan provided in his Verified Amended Complaint in the State Action:  322 Richbell Road, Apt. B4, Mamaroneck, NY 10543.  *See id.* ¶ 11.  However, on June 12, 2015, CS' process servers were advised by a resident at the Richbell Road address that O'Sullivan did not live there, and neighbors reported that Mr. O'Sullivan is unknown at the address.  *See id.* & Exh. 5.

CS then hired a private investigator to identify alternative addresses belonging to Mr. O'Sullivan, and on June 23, 2015 attempted service at another address, 2555 Youngs Avenue, Apt. 2B, Southhold, NY 11971-1698.  *See id.* ¶ 12 & Exh. 6.  However, once again, CS' process servers reported that Mr. O'Sullivan is unknown at that address.  *See id.*

By letters dated July 1, 2015 and July 23, 2015, CS requested that the Court authorize it to serve the Complaint upon Mr. Cox, as agent for O'Sullivan and Gyst, pursuant to Rule 4(e)(1) of the Federal Rules of Civil Procedure and New York Civil Practice Law and Rules § 308(5).  *See id*. ¶ 13 & Exhs. 7 and 8.  CS also repeatedly requested that Mr. Cox accept service.  *See id.*

On July 9, 2015, CS' counsel, Matthew Press, called the Court to state CS' concern that the delay in serving O'Sullivan and Gyst would be weighed against CS' in its request for preliminary injunctive relief.  *See* Press Dec. ¶ 14.  A law clerk advised that CS mention in its motion papers that CS kept chambers informed concerning its diligent efforts at service, and the

exigent need to make CS' motion.  *See id.*

Finally, at a hearing in the State Action on July 30, 2015, Mr. Cox stated that the Richbell Road address belongs to O'Sullivan's girlfriend, Jaya Chouhan, and that he would accept service there.  *See id.* ¶ 15.  Thereafter, CS' process servers completed service of Gyst on August 7, 2015, and of O'Sullivan on August 10, 2015.  *See id.*

## III.   ARGUMENT

Under Rule 65 of the Federal Rules of Civil Procedure, a court should grant a temporary restraining order and preliminary injunction where a plaintiff demonstrates (a) irreparable harm and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping in favor of the moving party.  *See Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir. 2010) (confirming standard); *Esbin & Alter, LLP v. Sabharwal, Globus, & Lim, LLP*, 403 F. App'x 591, 592 (2d Cir. 2010); *WPIX, Inc. v. ivi, Inc.*, 765 F. Supp. 2d 594, 601 (S.D.N.Y. 2011) aff'd, 691 F.3d 275 (2d Cir. 2012). [4]

### A.   CS is Likely to Succeed on the Merits of its Copyright and Trade Secret Claims against O'Sullivan and Gyst

As set forth below, CS is likely to succeed on the merits of its copyright, trade secret and breach of contract claims.  However, at a minimum, CS has established sufficiently serious questions going to the merits of its claims to make them a fair ground for litigation.

#### 1.   CS is Likely to Succeed on the Merits of its Copyright Claim

The Copyright Act of 1976 authorizes courts to "grant temporary and final injunctions on

---

[4] The standard for granting a temporary restraining order is the same as for granting a preliminary injunction.  *See, e.g., Ahmad v. Long Island University,* 18 F.Supp.2d 245, 247 (E.D.N.Y. 1998) ("[T]he standards which govern consideration of an application for a temporary restraining order ... are the same ... as those which govern a preliminary injunction.") (citing *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992)).

such terms as [they] may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). *See Salinger v. Colting*, 607 F.3d 68, 75 (2d Cir. 2010). To prevail on a claim of copyright infringement, a plaintiff must establish (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 448 (S.D.N.Y. 2014) (finding plaintiff adequately alleged infringement by former licensee of copyrighted product).

### a. CS Owns a Valid Copyright in the Adaptive Audio Software

First, CS owns a valid copyright in the Adaptive Audio Software. On May 1, 2015, CS registered Adaptive Audio Source Code Version 7 as a computer program with the United States Copyright Office (U.S. Reg. No. TX0008016083). *See* Clements Dec., Exh. 6. CS' registration of the software constitutes *prima facie* evidence of the validity of the copyright. *See* 17 U.S.C. § 410(c); *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997) (finding registration of copyright creates a rebuttable presumption that the work in question is copyrightable); *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 414 (S.D.N.Y. 1999) (same).

### b. Defendants Gyst CX Product Infringes on CS' Copyright in the Adaptive Audio Software

Next, CS has substantial evidence of infringement by Defendants. To establish infringement, the owner of a valid copyright must demonstrate that (1) the defendant actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's work. *See CJ Products LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 144 (E.D.N.Y. 2011) (enjoining defendant from selling infringing pillow product).

Unauthorized copying may be shown by direct or indirect evidence. *See id.* Here, on the Gyst website, O'Sullivan inadvertently admits that the *newly* offered Gyst CX utilizes the same technology as the Adaptive Audio Software that he previously developed and sold to CS. *See* Clements Dec. ¶ 37-42 & Exh. 9-10 ("Our technology has been (and continues to be) production proven over *several hundred million self-service telephone calls to date*") (emphasis added). In any case, on the Gyst website, O'Sullivan describes Gyst CX as a virtually identical software product, which monitors user behavior, analyzes samples, derives user skill levels and customizes individual calls. *See id.*

A plaintiff may also demonstrate copying by establishing that the defendant had access to the plaintiff's work, and the two works are substantially similar. *See Boisson v. Banian, Ltd.*, 273 F.3d 262, 269 (2d Cir. 2001); *Tradescape.com,* 77 F. Supp. 2d at 419; *City Merchandise v. Broadway Gifts, Inc.*, No. 08-Civ-9075, 2009 WL 195941, *1 (S.D.N.Y. January 27, 2009) ("To support an inference that copying took place, the indirect evidence must demonstrate both that the person who composed the defendant's work had access to the copyrighted material, and that there is 'substantial similarity' between the two works."). Here, O'Sullivan retained full access to the Adaptive Audio Software after he sold it to CS, as an employee, and was intimately involved in further developing and incorporating the Adaptive Audio Software into CS' IVR technology platform. *See* Clements Dec. ¶ 27. Once again, on the Gyst website, O'Sullivan admits that Gyst CX consists of the same technology as the Adaptive Audio Software that he previously developed and sold to CS. *See* Clements Dec. ¶¶ 37-42 & Exhs. 9-10. Likewise, O'Sullivan's description of Gyst CX indicates that it is so similar in structure and function to the Adaptive Audio Software that, under the circumstances, it is more likely than not that O'Sullivan copied at least some of its protectable literal and non-literal elements.

Accordingly, CS has demonstrated that it is likely to succeed on the merits of its claim of copyright infringement.

### 2.    CS is Likely to Succeed on the Merits of its Trade Secret Claim

CS also is likely to succeed on the merits of its trade secret claim under Virginia law.  To establish a claim under the Virginia Uniform Trade Secret Act ("VUTSA"), a plaintiff must prove that (1) the information in question constitutes a trade secret, and (2) the defendant misappropriated it.  *See MicroStrategy, Inc. v. Bus. Objects, S.A.*, 331 F.Supp.2d 396, 416 (E.D.Va.2004); *Informatics Applications Grp., Inc. v. Shkolnikov*, 836 F. Supp. 2d 400, 422 (E.D. Va. 2011).

VUTSA defines a trade secret broadly as any:

> [I]nformation, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

VA. CODE ANN. § 59.1–336; *see Trident Products & Servs., LLC v. Canadian Soiless Wholesale, Ltd.*, 859 F. Supp. 2d 771, 778 (E.D. Va. 2012) aff'd, 505 F. App'x 242 (4th Cir. 2013).  "The determination of whether a trade secret exists is generally a question of fact to be determined from the greater weight of the evidence." *Id.*

CS's Adaptive Audio Software and other confidential business information—including the identities and profiles of CS' clients; CS' marketing and business strategies; the terms and conditions of CS' contracts, including pricing; and CS' core IVR software and technology—plainly is subject to trade secret protection. *See Decision Insights, Inc. v. Sentia Grp., Inc.,* 416 F. App'x 324, 329 (4th Cir. 2011) (finding computer program source code a trade secret);

*Informatics Applications*, 836 F. Supp. 2d at 423 (finding methods for developing and improving functionality of information systems constituted trade secrets); *MicroStrategy*, 331 F. Supp. 2d at 422-26 (finding strategic analysis of competing software product, novel sales techniques, list of target customers and company pricing information constituted trade secrets); *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F. Supp. 2d 565, 575 (E.D. Va. 2004) (finding aerodynamic flutter test and results constituted trade secret).   CS would not have disclosed any of this information to O'Sullivan if he had not been sworn to secrecy under the Employment Agreement, Proprietary Information Agreement and Employee Handbook.   Finally, CS took reasonable efforts to maintain the secrecy of this information by, for example, storing its proprietary software behind corporate firewalls with access—via secure remote services— granted only to trusted individuals with the proper password levels.

To prove misappropriation of a trade secret, the plaintiff must establish that the defendant: (1) acquired, disclosed, or used a trade secret owned by the plaintiff without express or implied consent; and (2) knew or had reason to know that its knowledge of the trade secret was either acquired under circumstances giving rise to a duty to maintain its secrecy or derived through a person owing such a duty to the plaintiff.   *See MicroStrategy*, 331 F.Supp.2d at 417; *MicroStrategy, Inc. v. Li*, 268 Va. 249, 263, 601 S.E.2d 580, 589 (Va. 2004) (citing VA. CODE ANN. § 59.1–336); *Trident Products*, 859 F. Supp. 2d at 780.[5]

"Generally, a former employee has a duty not to reveal confidential information obtained through his employment, and not to use such confidential information after he has left his

---

[5] The VUTSA defines "misappropriation" to include the: "2. Disclosure or use of a trade secret of another without express or implied consent by a person who . . .  (b) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use."  VA. CODE ANN. § 59.1–336.

employment." *Tao*, 299 F. Supp. 2d at 575 (citing *Bull v. Logetronics, Inc.*, 323 F.Supp. 115, 133 (E.D.Va.1971)); *see AWP, Inc. v. Commonwealth Excavating, Inc.*, No. 5:13CV031, 2013 WL 3830500, at *6 (W.D. Va. July 24, 2013) (finding employer stated cause of action of misappropriation of trade secrets by former employee).

Here, as set forth above, O'Sullivan admits on the Gyst website that he and Gyst are using the same predecessor technology that O'Sullivan developed and sold to CS under the APA, and O'Sullivan's description of Gyst CX indicates that it has the same structure and elements as the Adaptive Audio Software, and functions identically. *See* Clements Dec. ¶¶ 37-42 & Exhs. 9-10. Furthermore, in the course of two years of employment as a senior executive of CS, O'Sullivan obtained critical confidential information concerning CS—including the identities and profiles of CS' clients; CS' marketing and business strategies; the terms and conditions of CS' contracts, including pricing; and CS' core IVR software and technology. *See* Clements Dec. ¶¶ 27-30. O'Sullivan and Gyst are now using CS' confidential and proprietary trade secret information without its consent to compete directly against CS—by offering CS' competitors the ability to replicate the functionality of the Adaptive Audio Software, without making the substantial investment in money and effort that CS has made to purchase and develop that asset.

Accordingly, CS has demonstrated that it is likely to succeed on the merits of its claim for misappropriation of trade secrets and confidential information.

### 3.    CS is Likely to Succeed on the Merits of its Breach of Contract Claim

Finally, CS is likely to succeed on the merits of its breach of contract claims.

Virginia courts routinely enforce appropriate agreements for the non-disclosure of confidential business information—even where such agreements lack any geographic or temporal limitations. *See Decision Insights*, 416 F. App'x at 332 (finding contractual language of non-disclosure agreement broad enough to protect proprietary materials of software company not

qualifying as trade secrets under the VUTSA); *Bowe Bell & Howell Co. v. Harris*, 145 F. App'x 401, 403 (4th Cir. 2005) (granting preliminary injunction in favor of software company against former employees utilizing company's technology in violation of nondisclosure agreements); *Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 828-29 (E.D. Va. 2011) (finding contractual non-disclosure agreement enforceable against former employee of software company).

Under the APA, O'Sullivan and ID unequivocally sold CS exclusive ownership of the Adaptive Audio Software, *see* APA § 2.1, including "all (i) works of authorship including, without limitation, computer programs, source code, and executable code, whether embodied in software, firmware or otherwise, documentation, designs, files, records, data and mask works, (ii) inventions (whether or not patentable), improvements, and technology, (iii) proprietary and confidential information, trade secrets and know how, (iv) databases, data compilations and collections and technical data, (v) logos, trade names, trade dress, trademarks and service marks, (vi) domain names, web addresses and sites, (vii) tools, methods and processes, and (viii) any and all instantiations of the foregoing in any form and embodied in any media."  APA § 1.

Under the Proprietary Information Agreement, as incorporated into the Employment Agreement, *see* Employment Agreement § 7(a), O'Sullivan committed that "[a]t all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use, or publish any of the Company's Proprietary Information," Proprietary Information Agreement § 1.1, which was defined to include "trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques," *id.* § 1.2.  Likewise, in the Employee Handbook, O'Sullivan separately agreed "not to release, disclose, publish or discuss confidential information or Company trade secrets, including but not limited to client names or

information, contractual information including terms and conditions, pricing or similar information, technical information, rates, billing information or financial information (including names or locations of financial institutions)."

As set forth above, in creating and marketing Gyst CX—in direct competition with CS—O'Sullivan plainly breached the foregoing provisions of the APA, Employment Agreement, Proprietary Information Agreement and Employee Handbook.  Accordingly, CS is likely to succeed on the merits of it breach of contract claims.

### B.    CS Will Suffer Irreparable Harm if Injunctive Relief is Not Granted

CS will suffer irreparable harm if O'Sullivan and Gyst are permitted to compete against CS in the same IVR technology market, utilizing the Adaptive Audio Software and other technology and confidential business information owned by CS.

Irreparable harm is established where monetary damages will be inadequate to compensate the plaintiff if it is denied a preliminary injunction but ultimately prevails on the merits.  *See Salinger*, 607 F.3d at 80.  A plaintiff who makes out a *prima facie* case of copyright infringement is entitled to a preliminary injunction without a detailed showing of irreparable harm.  *See Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3d Cir. 1983) (citing 3 NIMMER ON COPYRIGHT § 14.06[A], at 14–50, 14–51 & n. 16 (collecting authorities)).

In the copyright context, courts have found irreparable harm where, as here, (1) the defendant is competing in the same market, *see Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc*., 312 F.3d 94, 96 (2d Cir. 2002) (finding irreparable harm established where allegedly infringing prayer book was sold in same market); *CJ Products*, 809 F. Supp. 2d at 145 ("Plaintiffs have satisfied their burden of establishing that they will suffer irreparable harm in the event that defendants continue to sell the products at issue."); (2) continuing infringement places

19

in jeopardy a plaintiff's reputation as a leader in its field, *see Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp. 2d 118, 131 (S.D.N.Y. 2000); and (3) the plaintiff's losses are "difficult to replace or difficult to measure," *Salinger*, 607 F.3d at 80; *Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir.1971) (Friendly, C.J.) (finding irreparable harm because "to prove the loss of sales due to infringement is ... notoriously difficult."); *WPIX*, 765 F. Supp. 2d at 618 (finding losses to an infringing competitor are "notoriously difficult" to prove and nearly impossible to quantify, and accordingly are considered irreparable); *Complex Systems, Inc. v. ABN AMRO Bank N.V.*, 2014 WL 1883474, * 11 (S.D.N.Y. May 9, 2014) ("[a] plaintiff has no adequate remedy at law where, absent an injunction, the defendant is likely to continue infringing its copyright(s)"); *Pearson Educ., Inc. v. Vergara*, 09 Civ. 6832(JGK)(KNF), 2010 WL 3744033, 2010 U.S. Dist. LEXIS 101597 (Sept. 27, 2010) (finding decline in sales of textbook as a result of greater access to infringing works is an injury difficult to quantify and which plaintiffs should not be expected to suffer).

The Second Circuit likewise has held that "the loss of a trade secret is not measurable in terms of money damages because "[a] trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (per curiam). Irreparable harm also is established where, as here, a high level employee with access to trade secrets and confidential information takes a competing position in which the disclosure and use of that information is inevitable. *See, e.g., Int'l Bus. Machines Corp. v. Johnson*, 629 F. Supp. 2d 321, 335 (S.D.N.Y.) ("The real or inevitable disclosure of trade secret information is sufficient to establish a real risk of irreparable harm.").

Finally, consistent with the foregoing, in § 10.1 of the Proprietary Information Agreement, O'Sullivan agreed that "it may be impossible to assess the damages caused by my

20

violation of this Agreement or any of its terms.  I agree that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to the Company and the Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach or threatened breach of this Agreement.  *Id.* § 10.1.

Accordingly, CS has established that it will be irreparably harmed if Defendants are not immediately enjoined from infringing upon CS Adaptive Audio Software, misappropriating CS' trade secrets and confidential business information, and from breaching the terms of their reasonable and appropriate non-disclosure obligations.

### C.      The Balance of Hardships Weighs Strongly in Favor of CS

Finally, the balance of hardships weighs strongly in favor of CS.  As set forth above, CS will suffer substantial hardship if an injunction is not granted, including potentially losing sales to Gyst or another IVR provider that is able to neutralize CS' advantage by licensing Gyst CX, and by losing its prestige as the market leader in adaptive IVR technology.  *See, e.g., WPIX, Inc. v. ivi, Inc*., 765 F. Supp. 2d 594, 621 (finding balance of hardships favored creator of copyrighted content).

On the other hand, O'Sullivan and Gyst can suffer no cognizable harm from being enjoined from their infringing activities.  It is axiomatic that "an infringer of copyright cannot complain about the loss of ability to offer its infringing product."  *Id.*; *see CJ Products*, 809 F. Supp. 2d at 146; *Mint, Inc. v. Amad*, No. 10 Civ. 9395 (SAS), 2011 WL 1792570, at *3 (S.D.N.Y. May 9, 2011) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."); *Warner Bros. Entm't Inc. v. RDR Books*, 575 F.Supp.2d 513, 553

(S.D.N.Y.2008) (citing *My–T Fine Corp. v. Samuels*, 69 F.2d 76, 78 (2d Cir.1934) (Hand, J.));

*Concrete Mach. Co. v. Classic Lawn Ornaments*, 843 F.2d 600, 612 (1st Cir.1988); *Apple

Computer,* 714 F.2d at 1255.  Enjoining O'Sullivan does not prevent him from earning a living

in the computer software industry, or even from competing against CS in the IVR technology

space, but only from competing against CS with the *identical* software product that O'Sullivan

sold to CS in the APA.

Accordingly, at a minimum, the Court should issue an injunction on grounds that CS has

established sufficiently serious questions going to the merits of its claims to make them a fair

ground for litigation, and the balance of hardships tips in CS' favor.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that this Court grant the foregoing temporary and preliminary injunctive relief and all such further relief as the Court deems appropriate.

Dated:  New York, New York
          August 17, 2015

Respectfully submitted,

**PRESS LAW FIRM PLLC**

By:   */s/ Matthew J. Press*
          Matthew J. Press

144 East 44th Street, Eighth Floor
New York, NY  10017
tel: (212) 922-1111
fax: (347) 342-3882
cell: (347) 419-0983

*Attorneys for Plaintiff*

23