UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
                                                    :
CONTACT SOLUTIONS, LLC,                             :
                                                    :
                              Plaintiff,            :     15-cv-04292 (RWS)(JLC)
                                                    :
            – against –                             :     **DECLARATION OF**
                                                    :     **DANIEL O'SULLIVAN IN**
DANIEL O'SULLIVAN and GYST, INC.,                   :     **OPPOSITION TO MOTION**
                                                    :     **FOR PRELIMINARY**
                              Defendants.           :     **INJUNCTION AND IN**
                                                    :     **SUPPORT OF MOTION FOR**
                                                    :     **JUDGMENT ON**
                                                    :     **PLEADINGS**
                                                    :
----------------------------------------------------------------------- x

I, DANIEL O'SULLIVAN, declare under penalty of perjury pursuant to 28

U.S.C. §1746 that the foregoing is true and correct, to the best of my knowledge, information

and belief:

1.      I am the Chief Executive Officer of Gyst, Inc., a defendant in the above-

captioned action ("Gyst").  I am also an individual defendant herein.

2.      "Gyst Inc." is a registered trade name for Phoenix Park, Inc., a Delaware

corporation.  I am the sole shareholder of Phoenix Park, Inc.

**Background**

3.      I graduated from the Dublin Institute of Technology in 1976 with a degree

in electrical engineering and electronics.  Following graduation, I attended the Polytechnic

Institute of New York University and received a Master's degree in computer science in 1978.  I

was also awarded teaching fellowships in numerical analysis and logic from Polytechnic.

4.      Between 1981 and 1987 I worked as a member of the technical staff at AT&T Bell Labs where I focused on T1 digital signal processing, Digital Access and Cross-Connect Systems software development and digital switching and network design.

5.      After leaving Bell Labs, I co-founded Next Generation Information, Inc., a company specializing in interactive voice response (IVR) technology for the transportation industry.  IVR is a technology that allows a computer to interact with humans through the use of voice and tones input via a touch-tone telephone keypad.

6.      After running Next Generation Information, Inc. for a decade, I sold the company and founded Interactive Digital, Inc. ("IDI").  IDI's technology, which would become known as Adaptive Audio, did not relate to a single type of IVR market (such as Next Generation's focus on transportation its clients), but was rather designed to make *any* IVR system more efficient by shortening the length of calls within the IVR system, and improving the user experience so that callers would be less likely to request assistance from a live operator.

### How Adaptive Audio Works

7.      My initial invention, which received a US patent, worked by listening to calls placed to an IVR system and monitoring the time it takes for the caller to complete the first Sequence Interaction Point (SIP).  An SIP is any point in an IVR system where the caller is required to provide information to proceed.  The first SIP in many IVRs is the entry of an account number.  As an alternative example, with transportation system, the first SIP may require the caller choose among several options such as schedule information, fares, or to check the status of a flight.

8.      In its initial – patented – iteration, Adaptive Audio would measure the speed of each caller's response to the first SIP and assign a grade to the caller based upon a static set of criteria.  For example, in a banking IVR, callers who are able to provide their account

number within a short time, perhaps nine seconds after the completion of the prompt, might be given the highest grade.  In this case the speed at which subsequent prompts are provided will accelerate and the response time allowed would shorten.  In an alternative example, a caller who takes significantly longer to provide their account numbers may receive a low grade.  In this case, Adaptive Audio would slow down the speed at which the subsequent IVR prompts are delivered.

9.      The purpose of accelerating the calls to expert users is that shorter IVR calls are less expensive.  Companies using IVR's almost always also have toll-free telephone numbers, and pay the cost of all incoming calls.  Thus, it is in the client companies' interest to make calls end as quickly as possible, so long as the callers are able to complete all of the objectives of their calls.

10.     The purpose of decelerating the calls to users who appear to have difficulty with the IVR system is to prevent those callers from experiencing the frustration and difficulty that would lead them to request a live operator.  Any call that is transferred out of an IVR to a live operator is exponentially more expensive to the company.

11.     The ability of an IVR to assign a classification to a caller based upon the speed with which they complete the first SIP and, optionally, subsequent SIPs in the system, and then accelerate or decelerate the subsequent prompts based upon each caller's classification, is known as "adaptation."

12.     "Adaptation" was the basis of the Adaptive Audio technology that was patented in 1994.  The patent expired in 2013.

13.     At the time I received the patent, nothing in the Adaptive Audio technology assisted in the *development* of the classification/grading system that the program

would look to determine how to adapt any given call.  That is, the engineers running an IVR with Adaptive Audio would need to manually determine, and then input, the values for the ranges of SIP response times that would constitute the several classifications.

14.     Between 2005-2009, if not earlier, I created a new technology which could measure samples of calls, chart the time it took each caller to complete each SIP, and aggregated the data (along with a related technology that would recognized callers' accents and adapted the prompts accordingly).  The new program would group these response times for the SIPs into categories based up their frequency, and assign each category a grade, much like plotting the results of an exam on a bell curve.  This process of "calibration" allowed Adaptive Audio to suggest, based on the results of the sample, what range of responses should define each of the several classifications.

15.     Once "calibration" was complete, Adaptive Audio would then begin adapting each call based on each callers' classification (as determined by the time needed to successfully complete each SIP).  Thus, while the classifications initially used by Adaptive Audio were created by trial and error, after 2005, classifications were based upon data received and analyzed from the IVRs themselves.

16.     In 2005-2009, I filed several patent applications relating to the ability of the Adaptive Audio technology to calibrate itself based upon a sampling of callers' responses to the SIPs of a system.  But no patent has issued.

### The 2012 Agreements with Contact Solutions

17.     In 2012, I entered negotiations with Contact Solutions LLC ("CS"). While our initial discussions regarded the possibility that CS might license Adaptive Audio from IDI, we eventually negotiated an Asset Purchase Agreement whereby IDI sold the Adaptive Audio program to CS.

18.     Unlike IDI's previous customers that were all entities that used IVRs to interface with the public, CS was an IVR hosting (i.e. outsourcing) company.  It was my understanding that CS intended to fully integrate Adaptive Audio into its IVR hosting platform and aggressively seek to deliver it to clients such that CS would be able to provide a superior, and more efficient, IVR system than its rival IVR hosting companies.  For avoidance of doubt, Adaptive Audio is not an IVR hosting technology.  It is a technology that aims to make any IVR – in-house or outsourced – more efficient.

19.     The assets transferred under the APA were defined and limited and included (i) a single domain name, (ii) a Dell personal computer along with peripheral hardware; (iii) the Adaptive Audio patent issued on February 20, 1996, four patent applications filed in 2005, 2007, 2008 and 2009, some of which had expired and were considered potentially abandoned; (iv) the Adaptive Audio API source code; (v) the Adaptive Audio user interface source code; (vi) the Adaptive Audio configuration files; (vii) the Adaptive Audio software installation program; and (viii) the Adaptive Audio users guide.  (*See* Exhibit [] to the September 22, 2005 Declaration of Robert Landy at Exhibit A thereto).

20.     Under the APA, CS paid IDI $50,000 for the technology and agreed to pay an additional $50,000 should any additional patent applications be revived. In addition CS agreed to pay ID a contingency fee of 3% of the "measured savings" from any IVR system that used Adaptive Audio.

21.     Prior to the negotiation of the contingency payments based upon measured savings, the parties had been discussing a purchase price in excess of $400,000.

22.     The APA was executed along with an employment agreement whereby I joined CS for a minimum term of two years.  The purpose of the contingency-fee-based purchase

price in the APA was, in part, to provide me with an incentive to work to ensure that Adaptive

Audio produced maximum efficiencies for CS' clients.

23.     In addition to the contingency payments under the APA, under the

employment agreement, I was entitled to receive a commission with respect to purchase orders

from a select group of clients with whom I had a pre-existing relationship.  These commission

payments were separate from the contingency fee payments under the APA and were not subject

to the performance of Adaptive Audio.

24.     In addition to transferring ownership of the Adaptive Audio computer

code and related files, the APA contained a restrictive covenant whereby I agreed not to compete

with CS for a term of two years commencing in May 2012.  That restrictive covenant expired in

May 2014, the same time that I was terminated from the company.

25.     I understand that CS contends I am also subject to an agreement titled the

"employee proprietary information, inventions, non-competition and non-solicitation agreement"

which I did not sign.  While this unsigned agreement also contains a covenant against

competition which would extend for an additional 12 months beyond May 2014, the extended

restrictive covenant would only become effective were I to have resigned from the company or

have been terminated for cause.  Neither of these events occurred, as my contract which expired

in May 2014 was not renewed.  I did not resign.

### The Early Days at Contact Solutions

26.     In my initial six months at CS, I spent a considerable time working with

the technical staff in order to make Adaptive Audio work on CS' IVR hosting system.  CS'

technology was programmed in the Java computer language, whereas Adaptive Audio was a

program written in C and C++.  It is not possible to simply convert one language into another.  I

am not proficient in Java programming and could not translate Adaptive Audio to work with the

CS system.  Instead, I reviewed the then-most-recent version of the Adaptive Audio code (which at the time was version 7) line-by-line with the CS programmers.  As the CS programmers learned what each line of C and C++ code did, they were able to replicate that functionality in Java.  After several months of working together, CS had created an operating Java version of Adaptive Audio.

27.     At no time during my employment at CS was I ever given a copy of the Java version of Adaptive Audio.

28.     Along with this initial project, I was asked to focus my efforts on assisting the CS technical, sales and client services staff to identify clients whose IVR's were most likely to benefit from Adaptive Audio, and to assist in determining what programming or other technical changes would be required to provision those clients' IVR systems with Adaptive Audio (as well as calibrate the system, and turn on the adaptation function, etc.).

29.     After several months, we had identified a minimum of 28 IVR's that were just the initial group of existing CS clients likely to benefit from Adaptive Audio.  However, the program was only ever installed for three of them.

30.     After CS integrated Adaptive Audio with three of their IVR clients, it made no further attempts to integrate the technology with any of their other, and larger, clients. Moreover, when the initial performance of Adaptive Audio with respect to these three small clients was disappointing, CS refused to adjust the adaptation parameters that had been implemented for each classification of caller.  This process, known as "tuning", was often necessary before Adaptive Audio customers would see improved efficiency in their IVR systems.  This fact was well known to CS at the time.

31.     "Tuning" is the process of finding, by trial and error, the optimal adjustments for each classification group to promote efficiency.  For example, even for expert callers, there is a point where the IVR prompts can go too fast, and lead to errors and hang-ups. Tuning is figuring out the most effective adaptations to make.

32.     Prior to the sale of Adaptive Audio to CS, IDI would need to tune Adaptive Audio after initial implementation for approximately 90% of its customers.  CS was aware that successful integration of Adaptive Audio would require tuning, but refused to do so.

### Contact Solutions Fires its CEO and Sales Staff, and then Stops Supporting Adaptive Audio

33.     Around the same time that CS refused to tune Adaptive Audio in the three IVR systems where it had been integrated, and refuse to integrate the technology with any additional systems, they also fired Paul Logan, the CEO and principal founder of the company who had led the initiative to acquire Adaptive Audio in the first place, as well as several other senior company leaders.

34.     Though the salesforce would eventually be replaced, as would the CEO, CS' efforts to integrate Adaptive Audio into the IVRs of its existing and new clients, as well as to seek out business from those potential clients listed in the employment agreement as "commissionable," never resumed.  As such, for approximately 18 months of my 24-month contract, CS' efforts to promote Adaptive Audio and to sell to the "commissionable" prospective clients were salutary at best.

### Contact Solutions Terminates Me and Shortly Thereafter Implements Adaptive Audio with Its Largest Client: Xerox

35.     In November 2013, CS informed me that it would not renew my contract upon expiration in May 2014.  At the time, I was offered a lump sum payment equaling the sum of the remaining salary payments under the two-year term of the employment agreement (with

no allowance for contingency fee or commission payments) in order to terminate my employment immediately.

36.     I refused the offer, explaining to CS that I would rather spend the remaining four and a half months working diligently to make Adaptive Audio a valuable component to their IVR hosting system and to assist in CS' sales efforts.

37.     When my employment concluded in May 2014 I had not received a single contingency payments under the APA or commission under the employment agreement.

38.     However, a few months after CS terminated me, I received a call from Keith Darter, a senior member of the CS sales team.  Mr. Darter was not aware that I was no longer working with CS.  He called me with a question regarding the integration of Adaptive Audio into the IVR of one of CS' largest clients, which I understood to be Xerox.  Had CS successfully integrated Adaptive Audio to the Xerox IVR during my tenure there, the resulting contingency payments under the APA would have been very material.

### I Create a New Technology – Gyst CX – File a Patent Application, and Create a Website to Begin Marketing.

39.     In the months following May 2014, I worked on developing a new technological method to improve the efficiency of IVR systems.  Rather than writing computer code, I first worked on developing the architecture, or design of the new technology and then committed that architecture to writing in the form of a US patent application.  I launched the website, www.gystusa.com in February 2015.  After several revisions and consultation with counsel, I filed a patent application for Gyst in August 2015.

40.     I began my new venture with full appreciation of the obligations placed upon me under the APA and in the employment agreement.  Because the term of the restrictive covenant against competition had expired, I was free to compete with CS so long as I did not do

so using the computer program that I had sold them.  As such, I invented and wrote the new

computer program, from whole cloth.  Though I did routinely review the expired patent and the

patent applications; I did so to ensure the Gyst provided a unique functionality that is, in my

opinion, unique and patentable.

41.     Like the old version of Adaptive Audio (which is the subject of the

expired patent) this new technology, Gyst CX,  will also make IVR systems more efficient by

either accelerating IVR prompts or slowing them down and providing additional response time

and other functions based upon data received from the caller during the initial portion of their

call.

42.     However, Gyst CX calibrates and categorizes callers based upon different

criteria.  Rather than focusing on the speed with which the caller accomplishes a particular  SIP,

Gyst CX calibrates and categorizes based upon the speed with which a caller arrives at Sequence

Completion Points ("SCPs").  The SCP is based upon the caller's goal for interacting with the

IVR, or when the IVR completes a logical sequence of SIPs.

43.     For example, if a user calls the IVR of an airline, the first SIP may be for

the caller to choose an option from the menu which may include "find a flight," "book award

travel," "check the status of a flight," "claim mileage credit," etc.  The SIP will be complete

when the caller chooses from the menu.  However, at that point during the call, the caller will not

have achieved their goal or performed a logical sequence of steps required to achieve an

objective of the IVR.  The SCP occurs when the caller obtains the information they are looking

for or accomplishes a logical sequence of steps required to achieve an objective of the IVR.  In

order to arrive at an SCP, the caller may need to navigate through several SIP's.  For example, in

order to find a flight, a caller would need to (i) choose "find a flight" from the initial menu; (ii)

enter the desired departure city; (iii) enter the desired destination city; and (iv) enter the desired date of travel.  As such, in this case the SCP would require a minimum of four SIPs.  Since Gyst CX calibrates in the time needed to reach the first SCP, it is only appropriate for more complex IVR systems, where callers are likely to have several goals and thus need to reach several SCPs.

44.    In addition, Gyst CX has been designed as a cloud-based system whereas Adaptive Audio is an enterprise system.  This means that Adaptive Audio is a program that must be loaded directly into, or close to the servers operating the IVR.  Since CS is an IVR hosting company, there is no reason for it not to use an enterprise system.

45.    Gyst is not a hosting company, and intends to sell its technology to clients who use IVR systems to interact with their customers, much like IDI did prior to the APA.  These prospective clients may own their own IVR systems or they may use a hosting company such as CS.  Gyst CX is a technology that clients will be able to use remotely in a cloud-based architecture.  It will not need to be loaded into the underlying IVR systems, but may rather reside on remote servers maintained by Gyst, and communicate in real time with the client IVR systems and instruct them on how to adapt for each particular caller.

46.    The source coding for the SCP-calibrating-cloud-based Gyst written to date does not remotely resemble the source coding for the SIP-calibrating-enterprise-based Adaptive Audio.  Nor will any subsequent lines of code that I write in the future.

47.    While I have recently begun writing the code that will support Gyst, at the time the Complaint in this action was filed, I had yet to write a single line of code.  Since then, the code that I have written relates to the communications that will occur between the Gyst cloud server and the clients IVR(s).  This is a functionality that does not exist in Adaptive Audio.

48.     As is commonly the case with technology startup companies, after designing the technology and filing a patent for the idea, I began working to market it even though I had yet to write the code to implement the technology.  These marketing efforts included the creation and publication of the website www.gystusa.com.

49.     As of the date of this declaration, Gyst has yet to secure its first client.

### The Westchester County Supreme Court Action

50.     In February 2015, I filed a complaint in the Supreme Court of the State of New York against CS for breach of the APA, the employment agreement, and the covenant of good faith and fair dealing.  That action is captioned *Adaptivity Research Inc. et al. v. Contact Solutions, LLC* (N.Y. Sup. Ct. Westchester County, Index No. 57577/2015) (the "Westchester Action").

51.     CS moved to dismiss the complaint in the Westchester Action on April 10, 2015.  On April 30, 2015, CS wrote to the Court asking that the motion be granted with prejudice notwithstanding the fact that my counsel had yet to file an opposition.

52.     On May 8, 2015, Justice Alan Scheinkman held a conference during which the Court provided the parties with guidance on its initial inclinations regarding the merits of the claims as well as CS's motion.  In doing so, Justice Scheinkman suggested that I amend my complaint and limit the causes of action to those described in the preceding paragraph.  My counsel filed an amended complaint on May 22, 2015.

### Contact Solutions Files the Instant Case Before
### I Had Written a Single Line of Code for Gyst CX

53.     Approximately 3 weeks after the May 8 conference in the Westchester Action, CS filed the instant action alleging breach of the same agreements at issue in the

Westchester Action and also alleging that the Gyst CX code infringes its recently obtained copyright of the Adaptive Audio version 7 code.

54.    Interestingly, it appears that CS' recently-obtained copyright was for the C and C++ program that I wrote in the mid-1990s and sold to them, as opposed to the Java program I helped them develop in 2012 and that runs CS's Adaptive Audio program.

55.    I understand from reviewing CS' complaint and motion for a preliminary injunction that CS takes issue with certain statements on the website www.gystusa.com which claims that "[o]ur technology has been (and continues to be) production proven over several hundred million self-service telephone calls" and "our clients have saved hundreds of millions of dollars".  These statements relate to the facts that (i) I am the inventor of the IVR technology described in the website (and in the expired patent and the patent application described above), and (ii) that this technology has a proven track record which was largely amassed by my company Interactive Digital prior to the sale of the Adaptive Audio program to CS.

56.    To date, I have drafted approximately 560 lines of code for Gyst CX.  By contrast, I recall that the code for the final C/C++ version of Adaptive Audio contained approximately 2500-3000 lines.

57.    Should this Court issue an order that enjoin me from developing and marketing the Gyst CX product described in the www.gystusa.com website, it would amount to a a wholesale prohibition on my ability to operate my business.

58.    On a small number of occasions in the last 6-months of my time at CS, I forwarded emails to my girlfriend reflecting my attempts to cause CS to actively promote Adaptive Audio and CS' unwillingness to do so.  I did this, as part of a personal communication with my romantic partner, with whom I share a home, in order to explain to her the frustrations I

was encountering at work.  These emails appear at Exhibit 8 of Vete Clements' August 17, 2015

Declaration.

Dated:   Mamaroneck, New York
         September 22, 2015

_____

Daniel O'Sullivan